**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-03378-STV

K.C.,[1]

Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

---

**ORDER**

---

Magistrate Judge Scott T. Varholak

This matter is before the Court on Plaintiff K.C.'s Complaint seeking review of the Commissioner of Social Security's decision denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 U.S.C. § 401 *et seq.* [#1] The parties have both consented to proceed before this Court for all proceedings, including the entry of final judgment, pursuant to 28 U.S.C. 636(c) and D.C.COLO.LCivR 72.2. [#11] The Court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). This Court has carefully considered the Complaint [#1], the Social Security Administrative Record [#9], the parties' briefing [##10; 12; 13], and the applicable case law, and has determined that oral argument would not materially assist in the disposition of this appeal. For the following reasons,

[1] Pursuant to D.C.COLO.LAPR 5.2(b), "[a]n order resolving a social security appeal on the merits shall identify the plaintiff by initials only."

the Court **REVERSES** the Commissioner's decision and **REMANDS** for further proceedings.

## I. LEGAL STANDARD

### A. Five-Step Process for Determining Disability

"To qualify for DIB, a claimant must establish that he met the statutory requirements for disability on or before his date last insured." *Romero v. Saul*, No. CV 20-256 JFR, 2021 WL 1873468, at *1 n.6 (D.N.M. May 10, 2021) (citing 42 U.S.C. §§ 416(i)(3), 423(c)(1)); *see also Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010) (finding that claimant "had the burden of proving that she was totally disabled on [the] date [last insured] or before"). The SSA defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[2] 42 U.S.C. § 423(d)(1)(A); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "This twelve-month duration requirement applies to the claimant's inability to engage in any substantial gainful activity, and not just his underlying impairment." *Lax*, 489 F.3d at 1084. "In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility . . ., the Commissioner . . . shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

[2] "Substantial gainful activity" is defined in the regulations as "work that (a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510; *see also* 20 C.F.R. § 404.1572.

"The Commissioner is required to follow a five-step sequential evaluation process to determine whether a claimant is disabled." *Hackett v. Barnhart*, 395 F.3d 1168, 1171 (10th Cir. 2005). The five-step inquiry is as follows:

1. The Commissioner first determines whether the claimant's work activity, if any, constitutes substantial gainful activity;

2. If not, the Commissioner then considers the medical severity of the claimant's mental and physical impairments to determine whether any impairment or combination of impairments is "severe;"[3]

3. If so, the Commissioner then must consider whether any of the severe impairment(s) meet or exceed a listed impairment in the appendix of the regulations;

4. If not, the Commissioner next must determine whether the claimant's residual functional capacity ("RFC")—*i.e.*, the functional capacity the claimant retains despite his impairments—is sufficient to allow the claimant to perform his past relevant work, if any;

5. If not, the Commissioner finally must determine whether the claimant's RFC, age, education and work experience are sufficient to permit the claimant to perform other work in the national economy.

*See* 20 C.F.R. § 404.1520(a)(4); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); *Bailey v. Berryhill*, 250 F. Supp. 3d 782, 784 (D. Colo. 2017). "The claimant bears the burden of establishing a *prima facie* case of disability at steps one through four," after which the burden shifts to the Commissioner at step five to show that the claimant retains the ability to perform work in the national economy. *Wells v. Colvin*, 727 F.3d 1061, 1064 n.1 (10th Cir. 2013); *Lax*, 489 F.3d at 1084. "A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis." *Ryan v. Colvin*, 214 F. Supp. 3d 1015, 1018 (D. Colo. 2016) (citing *Casias v. Sec'y of Health & Hum. Servs.*, 933 F.2d 799, 801 (10th Cir. 1991)).

---

[3] The regulations define severe impairment as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

**B. Standard of Review**

In reviewing the Commissioner's decision, the Court's review is limited to a determination of "whether the Commissioner applied the correct legal standards and whether her factual findings are supported by substantial evidence." *Vallejo v. Berryhill*, 849 F.3d 951, 954 (10th Cir. 2017) (citing *Nguyen v. Shalala*, 43 F.3d 1400, 1402 (10th Cir. 1994)). "With regard to the law, reversal may be appropriate when [the Commissioner] either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards." *Bailey*, 250 F. Supp. 3d at 785 (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)).

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). "It requires more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax*, 489 F.3d at 1084). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Grogan*, 399 F.3d at 1261-62 (quoting *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992)). The Court must "meticulously examine the record as a whole, including anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met.'" *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir.

2007) (quotation omitted). The Court, however, "will not reweigh the evidence or substitute [its] judgment for the Commissioner's." *Hackett*, 395 F.3d at 1172.

## II. BACKGROUND

Plaintiff was born in August 1990. [AR 296][4] Plaintiff completed two years of college. [AR 354] Plaintiff is able to communicate in English. [AR 352] On August 27, 2021, Plaintiff filed her application for DIB. [AR 296] In the application, Plaintiff claimed a disability onset date of February 14, 2020, and thus Plaintiff was 29 years old at the time of the alleged onset. [*Id.*] Plaintiff initially claimed disability based upon an artificial tear in her spine and a pinched nerve in her spine. [AR 353] Plaintiff's most recent prior work experience was as a medical assistant at the University of Colorado Hospital. [AR 354]

### A. Medical Background[5]

Plaintiff has pain in her lower back that began in 2013 following an automobile accident. [AR 482] Plaintiff had been told that she had a slipped disc and a pinched nerve in her lower back. [*Id.*] She received injections and, according to Plaintiff, the pain had been getting better. [*Id.*] Following another motor vehicle accident on February 13, 2020, however, her symptoms worsened.[6] [AR 482, 656]

On the date of the accident, Plaintiff was taken to the emergency room complaining of neck and generalized back pain. [AR 672] Plaintiff explained that her

[4] All references to "AR" refer to the sequentially numbered Social Security Administrative Record filed in this case. [#9]
[5] Because the Court's resolution of the instant matter focuses on the ALJ's treatment of Plaintiff's physical conditions, the Court focuses on Plaintiff's physical conditions for which she claims disability.
[6] Approximately one month before the accident, Plaintiff had been treated for back pain. [AR 674]

vehicle had been rear-ended by a van traveling at a low speed. [*Id.*] She had full range of motion of her neck though there was pain with movement. [*Id.*] An x-ray of her cervical spine revealed reversed cervical curvature; mild retrolisthesis of C5 on C6 and C6 on C7; hypoplastic appearance of C7 and T1; and diminutive disc space as well as a question of fusion across the posterior disc. [AR 671, 827] The treating physician did not believe that any further imaging was needed. [AR 670]

Five days after the accident, Plaintiff sought outpatient treatment for pain running from her neck down to her lower back and in her left shoulder. [AR 667] She had indicated that cyclobenzaprine and ibuprofen were ineffective. [AR 666] She was thus given diclofenac, methocarbamol and acetaminophen. [*Id.*] She was also referred to massage and physical therapy. [*Id.*]

Plaintiff again sought outpatient treatment on February 20, 2020 for worsening back pain from the accident. [AR 662] She complained of significant lower back pain with shooting pain radiating up her spine as well as numbness in her right leg. [*Id.*] She had pain with flexion, extension and lateral rotation, and generally appeared uncomfortable. [*Id.*] An x-ray from that day revealed mild degenerative changes of the midthoracic and cervical spine as well as transitional lumbosacral anatomy which is likely congenital. [AR 661, 822] Physical therapy was recommended. [AR 661]

On March 3, 2020, Plaintiff was treated for symptoms from the accident. [AR 656] She had pain and mobility limitations, and was diagnosed with a thoracolumbar strain and possible cervical strain. [*Id.*] Plaintiff described the pain as constant and made worse by sitting, work and exercise. [AR 657] The pain radiated up her shoulder

and she had tingling in both hands. [*Id.*] Her average pain was 7.67 and could rise to nine on a scale of ten. [AR 658]

Notes from a March 9, 2020 physical therapy session indicate that Plaintiff's average pain scale was 6.33 out of ten. [AR 653] Plaintiff was unable to lie supine due to muscle spasms. [*Id.*] Notes from a March 13, 2020 appointment reflect that Plaintiff's pain level was eight out of ten. [AR 650] During a March 20, 2020 medical appointment Plaintiff described ongoing aching pain from the car accident, which waxed and waned. [AR 648] Plaintiff was diagnosed with: (1) lower back pain, transitional lumbosacral anatomy on the right, (2) suspected disc disruption in L4-5, (3) neck pain with mild degeneration of the cervical spine, and (4) whiplash syndrome. [AR 647]

Plaintiff was seen by a provider on March 25, 2020 complaining of lower back pain and lower and upper extremity neuropathy. [AR 645-46] She had pain shooting down her legs and found it difficult to find a comfortable position. [AR 646] Notes from March 31, 2020 indicate that Plaintiff had an average pain score of 6.33 out of ten. [AR 644] She described brief periods of improvement but her pain was exacerbated earlier in the week. [*Id.*] It was observed that she had a fear of movement. [*Id.*]

During an April 13, 2020 appointment Plaintiff described her pain as decreasing despite performing her daily home exercise program. [AR 639] Plaintiff indicated that she was unable to work due to the pain, which she rated as eight out of ten. [*Id.*] Plaintiff described two instances in which she experienced a sharp pain in her lower back that radiated to her legs. [AR 640] She further expressed weakness in her right leg. [AR 639] The plan was for Plaintiff to receive an epidural injection. [*Id.*]

On June 12, 2020, Plaintiff had the steroid injection but it worsened Plaintiff's pain symptoms. [AR 620, 628, 634-37] Plaintiff indicated that she was feeling more pressure in her pelvis following the injection as well as pain and weakness in her legs. [AR 634] Plaintiff described stabbing pain in her left side whereas the pain had previously been primarily in the middle and on the right. [*Id.*]

A June 26, 2020 MRI revealed broad central/right disc protrusion with associated focal annular fissure indents minimally contacting the traversing right L5 nerve root. [AR 488, 566, 818] There was also mild right neural stenosis. [*Id.*] No significant spinal canal stenosis was indicated. [*Id.*] At an appointment that same day, Plaintiff said her back was worse, she felt spasms, and there was new pain on her left side. [AR 628] Plaintiff indicated that Gabapentin did not help with the pain. [*Id.*] As a result, the provider stopped the Gabapentin subscription. [*Id.*]

Because the steroid injection made Plaintiff's pain worse, her provider decided that Plaintiff should pursue physical therapy. [AR 620-21] Plaintiff thus resumed physical therapy on August 19, 2020.[7] [AR 616] Plaintiff was described as "guarded in nearly all lumbar motions" and "intoleran[t] of most positions besides lying on side in flexed position." [*Id.*] Plaintiff described the pain as significantly limiting since the February 2020 accident. [AR 617] She indicated that she could barely tolerate any length of standing or sitting since the steroid injection. [*Id.*] Plaintiff stated that her right leg felt heavy and weak. [*Id.*] The plan was for Plaintiff to attend weekly sessions for eight weeks along with home exercise programs. [*Id.*]

[7] As indicated above, Plaintiff had participated in physical therapy earlier in the year. [AR 644, 653] She had stopped due to COVID. [AR 648]

During an August 21, 2020 medical visit Plaintiff described her pain as stable or possibly slightly worse into the left side since her steroid injection. [AR 613] Plaintiff and her provider discussed focusing on physical therapy for pain relief. [*Id.*] A therapy note from August 28, 2020 reflects an average pain score of 7.33 out of ten. [AR 611] Plaintiff's mobility tolerance in a supine position was improving. [*Id.*] Plaintiff was having pain with some exercises but was also "having some success with exercises." [*Id.*]

During a September 10, 2020 medical visit Plaintiff described increasing left greater than right below the belt-line lower back pain with radiation bilaterally to the buttocks and to the right foot. [AR 1044-45] She described her back pain as rating an eight out of ten. [*Id.*] She also reported increasing neck pain radiating to all digits of both hands. [*Id.*] She described her neck pain as constant and aching, rating it as a six out of ten. [*Id.*] Plaintiff reported that she was having difficulty performing activities of daily living such as walking and transferring from sitting to standing. [*Id.*]

A therapy note from September 11, 2020 indicates that Plaintiff was experiencing an average lower back pain score of 7.33 out of ten. [AR 609] Notes from September 18 and 25 reflect an average lower back pain of five out of ten, with ranges from four to six. [AR 602, 607] Notes from October 28, 2020 reflect an average pain score of four out of ten. [AR 589] Notes from November 20, 2020 indicate that physical therapy was helping. [AR 584]

Notes from December 22, 2020 and January 8, 2021 reflect an average lower back pain score of 4.67 out of ten, with pain ranging from three to seven. [AR 576, 581] During the December 22 visit, Plaintiff indicated that she spent most of her time in bed because she believed activity would increase the pain. [AR 581] During the January 8

visit, Plaintiff indicated that the previous day she had experienced a sharp anterior knee pain, radiculating down her right side with some numbness in her right foot. [AR 576]

An April 9, 2021 assessment indicated paracentral right L4-5 disc herniation with annular tearing as well as mild stenosis. [AR 563] Mild right L5 radicular pain without weakness was also noted. [*Id.*] The notes also reflect neck pain and mild degeneration of the cervical spine. [*Id.*]

Notes from a May 4, 2021 appointment reflect lumbar disc herniation with radiculopathy, cervical radicular pain, and Bertolotti's syndrome. [AR 479, 483] According to Plaintiff, her pain begins in the lower back and then radiates down her legs, primarily on the right side. [AR 482] She also reported weakness and numbing in both legs. [*Id.*] She stated that she cannot walk or stand for extended periods. [*Id.*] A lower back x-ray revealed relatively mild lower cervical levocurvature, mid-thoracic dextrocurvature, but no acute bony or soft tissue abnormalities. [AR 525]

A May 21, 2021 MRI of the lumbar spine revealed a bulging disc and right paracentral disc protrusion at L4-5 slightly increased since the 2020 MRI. [AR 473, 797] It also revealed an associated right lateral recess stenosis and mass effect on the traversing L5 nerves which was also slightly increased since the 2020 MRI. [*Id.*] Mild spinal canal stenosis was unchanged. [*Id.*] The MRI also indicated partially visualized intrauterine masses. [AR 473, 798]

Notes from a May 26, 2021 referral to the Spine Center reflect acute lower back pain with sciatica and unspecified back pain. [AR 467] The purpose of the referral was to receive steroid injections. [AR 468] And Plaintiff received multiple injections in the summer and fall of 2021. [AR 465, 499, 501, 504, 1035-41]

Notes from a June 10, 2021 appointment reflect lower back pain and bilateral buttocks pain. [AR 506] Plaintiff indicated that her pain was greater while standing. [*Id.*] Plaintiff also indicated that her prior neck pain had improved. [*Id.*; *see also* AR 1042-43]

Plaintiff received a steroid injection on September 1, 2021. [AR 1288] Notes from September 17, 2021 reflect pain on the right side of the lower back with palpation. [AR 518] They also reflect pain on flexion and extension, as well as pain on palpation of the bilateral sacroiliac joints. [*Id.*] In the lumbar spine, there was evidence of Bertolotti's syndrome with transverse process on the right. [*Id.*]

During a March 7, 2022 medical appointment Plaintiff indicated that steroid injections had helped for about six weeks but the pain returned. [AR 1285] A physical examination revealed positive bilateral Gaenslen's test, positive bilateral Patrick's test, positive bilateral sacroiliac joint compression test, and pain with bilateral facet loading maneuver. [AR 1286] On March 23, 2022, Plaintiff underwent an MRI of the lumbar spine. [AR 1233-34] This revealed: (1) L4-L5 mild bilateral foraminal narrowing with abutment of the L4 nerves and mild spinal stenosis, (2) enlarged uterus with multiple fibroids, incompletely evaluated, and (3) pseudoarticulation of the right L5 transverse process with the sacral ala, which can be associated with chronic back pain. [AR 1234] During a March 29, 2022 medical appointment Plaintiff reported that her back pain was radiating to the bilateral buttocks as well as paresthesia to the right dorsum of the foot. [AR 1284] A physical examination again revealed positive bilateral Gaenslen's test, positive bilateral Patrick's test, positive bilateral sacroiliac joint compression test, and pain with bilateral facet loading maneuver. [AR 1283]

A medical note from April 28, 2022 indicates that Plaintiff's back pain episodes are fluctuating but always present. [AR 1092] Plaintiff described the pain as stabbing in the mid-back down to muscle spasms in the lower back and numbness in the bilateral thighs. [*Id.*] Plaintiff said her pain ranged from seven to nine out of ten. [*Id.*] She stated that the pain was aggravated by bending, standing, sitting, exercise, and looking up. [*Id.*] Plaintiff said the pain was reduced with cold and heat. [*Id.*] The pain was described as limiting Plaintiff's ability to function and her quality of life. [*Id.*] A physical examination revealed tenderness at the lumbosacral junction and pain with extension, flexion and rotation. [AR 1095]

A note from June 3, 2022 reflects continued pain radiating down Plaintiff's thigh. [AR 1097] The pain was described as stabbing in the mid-back down to muscle spasms in the low back and numbness in the bilateral thighs. [*Id.*] Plaintiff once again said her pain ranged from seven to nine out of ten. [*Id.*] A physical examination once again revealed tenderness at the lumbosacral junction and pain with extension, flexion and rotation. [AR 1099] On June 20, 2022, Plaintiff received lidocaine injections. [AR 1103] Notes from July 26, 2022 indicate that Plaintiff's back was tender to palpation. [AR 1191]

During an August 10, 2022 visit Plaintiff indicated that the injection did not provide any pain relief. [AR 1105] Plaintiff explained that when she is sitting the pain can radiate up her spine and that if she stands too long the pain will radiate down her legs to her toes. [*Id.*] Plaintiff rated her pain as eight out of ten. [*Id.*] A physical examination once again revealed tenderness at the lumbosacral junction and pain with extension, flexion and rotation. [AR 1107] Plaintiff was also tender in the left and right

sacroiliac joints. [*Id.*] Plaintiff's diagnoses included: (1) chronic pain syndrome, (2) spondylosis without myelopathy or radiculopathy, lumbar region, (3) other intervertebral disc degeneration, lumbar region, (4) Bertolotti's syndrome, (5) sacroiliitis, not elsewhere classified, and (6) radiculopathy, lumbar region. [AR 1108] During a medical visit on August 19, 2022, Plaintiff described her pain as 7.5 out of ten. [AR 1111]

A note from September 14, 2022 indicates that Plaintiff's pain remained unchanged. [AR 1116] She rated her pain as 8.5 out of ten and described the pain as primarily localized in her lower back/buttock/tail bone and as sharp, with muscle spasms and numbness. [*Id.*] It was made worse with sitting, standing, and walking, and was alleviated when Plaintiff lay at a 90 degree angle. [*Id.*] Notes from a September 26, 2022 medical appointment reflect that Plaintiff's back was tender to palpation. [AR 1194]

During an October 12, 2022 medical visit Plaintiff rated her pain as seven out of ten. [AR 1121] She also reported feeling an electrical sensation when bending at the ankles. [*Id.*] A physical examination revealed sacroiliac tenderness, right greater than left. [AR 1124]

Notes from a November 7, 2022 medical appointment reflect that Plaintiff's back was tender to palpation. [AR 1203] A note from November 11, 2022 indicates that Plaintiff had begun physical therapy. [AR 1126] Plaintiff rated her pain as 8.5 out of ten. [*Id.*] A physical examination showed pain with lumbar flexion, extension, and rotation; and bilateral L3-4, L4-5, and L5-S1 tenderness; and tenderness at the lumbosacral junction. [*Id.*] The notes indicate that, since Plaintiff started treatment with a specialist for pain management in April, they had achieved 60 percent overall pain

relief, 60 percent functional improvement, and 50 percent quality of life. [AR 1092, 1130]

During a December 9, 2022 medical visit Plaintiff reported issues with stumbling, tingling, and numbness. [AR 1132] Plaintiff described her pain as 8.5 out of ten. [*Id.*] She said her pain increased with sitting, standing, or walking, but was relieved with lying down and taking medications. [*Id.*] Prior to the visit, Plaintiff had completed the six physical therapy sessions required to schedule a Bertolotti's injection. [AR 1135-36] The notes indicate that, since Plaintiff started the specialist treatment, they had achieved 60 percent overall pain relief, 60 percent functional improvement, and 60 percent quality of life. [AR 1136] The plan moving forward was to schedule the Bertolotti's injection and, if there was no improvement, to schedule a sacroiliac joint injection. [*Id.*] During a December 29, 2022 medical appointment Plaintiff experienced mild pain with bilateral lumbar facet loading maneuver. [AR 1281]

Notes from a January 23, 2023 medical appointment reflect that Plaintiff's back was tender to palpation over the lumbar-sacral spine. [AR 1207] Notes from a January 31, 2023 medical visit indicate that Plaintiff's pain "remains problematic and increasing." [AR 1139] Plaintiff rated her pain as an 8.5 out of 10. [*Id.*] She had not been able to begin physical therapy due to insurance issues but the notes indicate that Plaintiff had worked out those insurance issues and intended to restart physical therapy. [*Id.*]

Notes from a March 1, 2023 medical visit indicate that Plaintiff had restarted physical therapy, though she had missed some days due to transportation issues. [AR 1145] She rated her pain as an 8.5 out of ten. [*Id.*] Notes from a March 30, 2023 medical appointment reflect that Plaintiff had finished physical therapy. [AR 1151]

Plaintiff said that physical therapy mildly helped her pain but that the pain returned. [AR 1155] Plaintiff's pain was again reported as an 8.5 out of 10. [AR 1151]

During an April 10, 2023 medical appointment Plaintiff complained of lower back pain moving bilaterally to her tailbones and into her toes. [AR 1223-24] A physical examination revealed normal range of motion but pain with palpation in the lower right lumbar region of the spine near the transitional segment. [AR 1223] The primary diagnosis was Bertolotti's syndrome and Plaintiff was told that this was likely the source of her pain. [AR 1223-24] Notes from an appointment the next day reflect that Plaintiff's back was tender to palpation over the lumbar-sacral spine and a straightening of the lumbar lordosis. [AR 1218]

During an April 24, 2023 medical appointment Plaintiff rated her pain as an 8.5 out of ten. [AR 1157] She indicated that she was planning to return to physical therapy. [*Id.*] The records indicate that Plaintiff had been receiving injections in the L4-S1 area but that the doctors believed that her pain may be stemming from an area lower than where Plaintiff was receiving the injections. [AR 1160] The next day, Plaintiff rated her pain as eight out of ten. [AR 1215]

On May 5, 2023, Plaintiff underwent a CT scan of her lumbar spine and pelvis. [AR 1226-29] This showed transitional anatomy and right-sided Bertolotti syndrome. [AR 1229] It also revealed L4-L5 mild bilateral foraminal narrowing with abutment of the L4 nerves and mild spinal stenosis. [*Id.*] During a May 15, 2023 medical appointment Plaintiff rated her pain as eight out of ten daily, rising to nine at its worst and lowering to seven at its best. [AR 1226] During the physical examination Plaintiff experienced pain with palpation in the right lower lumbar region near transitional segment and pain with

extension. [AR 1229] Once again, the primary assessment was Bertolotti's syndrome. [*Id.*]

Notes from a June 13, 2023 medical appointment reflect ongoing pain in Plaintiff's right lower back region, rated at eight out of ten. [AR 1163] Plaintiff explained that she had completed six weeks of physical therapy without relief. [*Id.*] A physical examination revealed bilateral L3-4, L4-5, and L5-S1 tenderness. [*Id.*] Plaintiff also experienced pain in her lumbar spine with extension, flexion, and rotation. [AR 1165]

During a July 12, 2023 medical visit Plaintiff again rated her pain as eight out of ten. [AR 1173] Notes from that visit indicate that Plaintiff's treating physician recommended a right Bertolotti's injection. [*Id.*] A physical examination revealed tenderness in the right sacroiliac joint. [AR 1175] Plaintiff experienced pain in her lumbar spine with extension, flexion, and rotation. [*Id.*]

**B. Opinion Evidence**[8]

On September 2, 2020, Plaintiff underwent a functional capacity evaluation with a follow-up session on October 19, 2022. [AR 1243-44] During this follow-up session the examiner, Kristine M. Couch, OTR, noted that Plaintiff appeared to have declined in her capacities and tolerances. [*Id.*] She had a maximum seated tolerance of 24 minutes and a maximum standing tolerance of 33 minutes. [*Id.*] Her walking was limited to 75 feet and she walked with an ambulated, slow, even gait. [AR 1244, 1247] Plaintiff reported her pain as a nine out of ten. [AR 1246]

On December 2, 2021, Virginia D. Thommen, MD, a state agency consultative physician, conducted a residual functional capacity assessment. [AR 100-01] Dr.

---

[8] Once again, the Court focuses on the medical opinions related to Plaintiff's physical condition.

Thommen concluded that Plaintiff could occasionally lift/carry twenty pounds and frequently lift/carry ten pounds. [AR 100] Dr. Thommen opined that Plaintiff could sit, stand, and walk about six hours in an eight hour workday. [*Id.*] Dr. Thommen further opined that Plaintiff: (1) had unlimited ability to balance; (2) could frequently climb ramps and stairs, kneel, and crouch; and (3) could occasionally climb ladders, climb ropes, climb scaffolds, stoop, and crawl. [*Id.*]

On July 23, 2022, King S. Leong, MD, a state agency consultative physician, conducted a residual functional capacity assessment. [AR 113-16] Dr. Leong opined that Plaintiff could occasionally lift/carry twenty pounds and frequently lift/carry ten pounds. [AR 113] Dr. Leong further opined that Plaintiff could stand/walk for two hours and sit for a total of six hours in an eight-hour workday. [*Id.*] Dr. Leong opined that Plaintiff's ability to pull was limited. [*Id.*] According to Dr. Leong, Plaintiff could occasionally: (1) climb ramps, stairs, ladders, ropes and scaffolds; (2) stoop; (3) kneel; (4) crouch; and (5) crawl. [AR 114] Finally, Dr. Leong opined that Plaintiff should avoid even moderate exposure to vibration and hazards. [AR 115]

On February 14, 2025, Emily Dranginis, PA-C, submitted a letter indicating that Plaintiff was a patient of hers and that Plaintiff had severe back pain when sitting or standing for twenty minutes. [AR 55] Ms. Dranginis opined that, because of this pain, it is difficult for Plaintiff to work. [*Id.*]

On March 1, 2025, Donald J. Bernardini, MD, submitted a letter on Plaintiff's behalf. [AR 56] Dr. Bernardini explained that he had been treating Plaintiff for her ongoing pain and cognitive impairments resulting from her automobile accident. [*Id.*] According to Dr. Bernardini, Plaintiff suffers from ongoing pain and functional limitations,

and the pain is exacerbated by prolonged sitting, standing, and walking. [*Id.*] As a result of the pain, Plaintiff was unable to tolerate sitting, standing or walking for more than fifteen minutes at a time. [*Id.*] Moreover, Plaintiff had experienced post-concussive syndrome leading to cognitive difficulties including impaired concentration and memory loss. [*Id.*] Dr. Bernardini opined that Plaintiff's medical conditions prohibited her from engaging in gainful employment. [*Id.*]

**C. Procedural History**

Plaintiff's DIB application was initially denied on December 2, 2021. [AR 96-102] On February 7, 2022, Plaintiff requested reconsideration of that decision [AR 161] and on July 6, 2022, Plaintiff's DIB application was again denied [AR 104-18]. On September 13, 2022, Plaintiff filed a written request for a hearing before an Administrative Law Judge ("ALJ"). [AR 172-73] A hearing was conducted before ALJ Erin Justice on October 3, 2023, at which Plaintiff and vocational expert ("VE") Ashley Byars both testified. [AR 58-75] Plaintiff was represented at the hearing by an attorney, Peter McGuire. [*Id.*] On December 7, 2023, ALJ Justice concluded that Plaintiff was not disabled through September 30, 2021, the last date insured. [AR 123-33]

On June 4, 2024, the Appeals Council remanded the matter for a new hearing. [AR 141-42] On December 2, 2024, a hearing was conducted before ALJ Justice at which Plaintiff and VE Byars both testified. [AR 77-95] Plaintiff appeared pro se. [*Id.*] On December 5, 2024, ALJ Justice issued a decision denying Plaintiff benefits. [AR 35-48] Plaintiff requested a review of that decision by the Appeals Council, which denied her request for review on September 12, 2025. [AR 1-6] Plaintiff timely filed an appeal with this Court on October 27, 2025. [#1]

### D. The ALJ's Decision

On remand, the ALJ denied Plaintiff's DIB application after evaluating the evidence pursuant to the five-step sequential evaluation process. [AR 35-48] At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity from February 14, 2020, the alleged onset date, through September 30, 2021, her date last insured. [AR 38] At step two, the ALJ found that Plaintiff had the following severe impairment: degenerative disc disease and stenosis of the lumbar spine with radiculopathy. [AR at 38-40] At step three, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically exceeds the severity of one of the listed impairments in the appendix of the regulations. [AR 40-41]

Following step three, the ALJ determined that Plaintiff retained the RFC to perform sedentary work,[9] but with the following limitations:

> [Plaintiff] could lift 20 pounds occasionally and 10 pounds frequently; and could stand/walk for a total of two hours and sit for about six hours in an eight-hour workday. [Plaintiff] could occasionally climb ladders, ropes, scaffolds, ramps, and stairs; and could occasionally balance, stoop, kneel, crouch, and crawl. She needed to avoid even moderate exposure to vibrations, unprotected heights, and heavy machinery. [Plaintiff] needed to avoid concentrated exposure to fumes, dust, and pulmonary irritants.

[AR 41] The ALJ provided a narrative setting forth the relevant evidence considered in determining the RFC and explaining the weight given to each of the medical opinions in the record. [AR 41-45]

At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. [AR 45-46] Finally, at step five, the ALJ concluded that, considering Plaintiff's

---

[9] Sedentary work is defined to include work that "involves lifting no more than 10 pounds at a time." 20 C.F.R. § 404.1567(a). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id.*

age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed. [AR 46-48] Specifically, the ALJ agreed with the VE's testimony opining that Plaintiff could perform the following representative occupations: document preparer, call out operator, type copy examiner, tube clerk, address clerk, and surveillance system monitor. [*Id.*] Accordingly, the ALJ determined that Plaintiff was not under a disability from February 14, 2020 through September 30, 2021. [AR 48]

**III. ANALYSIS**

Plaintiff raises five challenges to the ALJ's decision on appeal. First, Plaintiff contends that the ALJ failed to discuss Plaintiff's medically determinable impairment of Bertolotti's syndrome at step two and failed to consider whether it resulted in any functional limitations for purposes of the RFC assessment. [#10 at 12-17] Second, Plaintiff argues that the ALJ failed to discuss Plaintiff's medically determinable but non-severe mental impairments within the RFC assessment. [*Id.* at 17-21] Third, Plaintiff argues that substantial evidence does not support the ALJ's symptom evaluation. [*Id.* at 21-28] Fourth, Plaintiff argues the ALJ erred in evaluating the persuasiveness of Ms. Couch's opinion. [*Id.* at 28-31] Finally, Plaintiff argues that the Appeals Council erred when it declined to consider Plaintiff's later-submitted evidence. [*Id.* at 32-36] Because the Court agrees that the ALJ failed to properly consider Plaintiff's Bertolotti's syndrome, the Court does not address Plaintiff's alternative arguments.

According to the regulations, a medically determinable impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Therefore, a

physical or mental impairment must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 404.1521. "Objective medical evidence is medical signs, laboratory findings, or both." 20 C.F.R. § 404.1513(a)(1). "Signs means one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [a claimant's] statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques." 20 C.F.R. § 404.1502(g). Here, Plaintiff's Bertolotti's syndrome is a physical abnormality[10] that was observed through an MRI. [AR 483, 796-98] Thus, the ALJ should have determined that Plaintiff's Bertolotti's syndrome was a medically determinable impairment. Her failure to do so was error. Indeed, the Commissioner does not argue to the contrary. [#12 at 4-8]

Instead, the Commissioner argues that any such error was harmless. [*Id.*] According to the Commissioner, "[i]n finding Plaintiff could perform a range of only sedentary work, the ALJ evaluated the record and discussed clinical conditions that caused symptoms associated with Bertolotti's syndrome, including severe degenerative disc disease and stenosis of the lumbar spine with radiculopathy." [*Id.* at 5] And the Commissioner argues that the ALJ discussed medical records that referenced Plaintiff's Bertolotti's syndrome.[11] [*Id.* at 5-6]

---

[10] "Lumbosacral transitional vertebra is an anatomical variation of the fifth lumbar vertebra in which an enlarged transverse process can form a joint or fusion with the sacrum or ilium. The association of that variant with low back pain and the change in the biomechanical properties of the lumbar spine is called Bertolotti's syndrome." *Jacobi v. Colvin*, No. 14 Civ. 3827 PAE JCF, 2015 WL 4939617, at *3 n.2 (S.D.N.Y. Aug. 19, 2015) (quoting Georgios Paraskevas, *et al.,* Lumbosacral transitional vertebra causing Bertolotti's syndrome: a case report and review of the literature, 2 *Cases Journal* 8320 (2009)).

[11] The Commissioner also points to the fact that the ALJ found Plaintiff more limited than Dr. Thommen, the state agency medical consultant at the initial level. [#12 at 6-7] But, as detailed above, there were a number of medical opinions in the record and the

The Court disagrees that this case presents "the right exceptional circumstance" to allow the Court to apply the harmless error rubric and "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the [ ] matter in any other way." *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004). According to the ALJ, the "medical evidence fails to disclose any significant clinical or diagnostic findings that would support [Plaintiff's] allegations of 'disabling' symptoms and limitations." [AR 43] But the ALJ's opinion never once mentions Bertolotti's syndrome, let alone analyze whether that condition "would support [Plaintiff's] allegations of 'disabling' symptoms and limitations." This is especially troublesome when on two occasions Bertolotti's syndrome was listed as Plaintiff's primary diagnosis and Plaintiff was told on one occasion that this was likely the source of her pain.[12] [AR 1223-24, 1229] To find this error harmless would be like finding harmless an ALJ's failure to mention (let alone analyze) a claimant's torn shoulder labrum diagnosis, because the ALJ mentioned the claimant's shoulder pain, provided some limitations due to that shoulder pain, and cited to a medical record that provided the torn shoulder labrum diagnosis. This the Court will not do. Thus, because the ALJ did not mention Plaintiff's Bertolotti's syndrome or analyze how that syndrome may have impacted Plaintiff's pain, her ability to work, or her RFC, the Court finds that the ALJ erred and that such error requires reversal. *Sandberg v. Colvin*, No. 12-cv-756-bbc,

---

fact that the ALJ found Plaintiff more limited than the least limiting medical opinion does not demonstrate that the ALJ properly considered Plaintiff's Bertolotti's syndrome.

[12] The Commissioner argues that these records are "irrelevant" because evidence is only relevant if it pertains to Plaintiff's abilities prior to her date last insured and these records were from visits after Plaintiff's date last insured. [#12 at 8-9] But as the Commissioner acknowledges, Plaintiff was diagnosed with Bertolotti's syndrome prior to her date last insured [AR 479, 483] and these later records help inform about that diagnosis and the source of Plaintiff's pain prior to her date last insured.

2013 WL 3934020, at *8 (W.D. Wis. July 29, 2013) (finding reversible error where the ALJ "did not discuss plaintiff's Bertolotti's syndrome or how it might affect her ability to heal").

## IV. CONCLUSION

Accordingly, for the foregoing reasons, the Court **REVERSES** the Commissioner's decision that Plaintiff was not under a disability within the meaning of the SSA, and **REMANDS** this matter to the Commissioner for rehearing and reconsideration consistent with this Order.

DATED: October 29, 2026

BY THE COURT:

s/Scott T. Varholak
United States Magistrate Judge